**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: September 10 2010**

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **In Re:** Nancy Elizabeth Pearsall | ) | Case No. 10-32672 |
| | ) | |
| | ) | Chapter 7 |
| **Debtor** | ) | |
| | ) | **JUDGE MARY ANN WHIPPLE** |
| | ) | |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO REDEEM

The court held evidentiary hearings on June 9, 2010, and July 22, 2010, on Debtor Nancy Elizabeth Pearsall's motion to redeem [Doc # 16] ("Motion") a motor vehicle under 11 U.S.C. § 722 from the lien of Lakewood Acceptance Corporation d.b.a. C.N.A.C., an assignee of J.D. Byrider ("CNAC") and CNAC's objection to the motion [Doc. # 22].[1] The court must decide the value of Debtor's motor vehicle under § 506(a)(2) of the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), 11 U.S.C. § 506(a), which

---

[1] The United States District Court for the Northern District of Ohio has jurisdiction over Debtor's chapter 7 case pursuant to 28 U.S.C. §§ 1334(a) and 157(a). It has referred all cases under title 11 and any or all proceedings in this district arising under title 11 or arising in a case under title 11, including the instant motion to redeem, to the bankruptcy court. General Order 84-1. The motion to redeem is a core proceeding that this court may hear and determine. 28 U.S.C. § 157(b)(1) and (b)(2)(K) and (O).

became effective in cases filed on or after October 17, 2005, as this one was.

An individual debtor may redeem consumer goods from a lien securing a dischargeable consumer debt, if the property is exempt under § 522 or has been abandoned under § 554, by paying the lienholder in full at the time of redemption the amount of the "allowed secured claim" that is secured by the collateral. 11 U.S.C. § 722. The "allowed secured claim" that Debtor must pay to redeem her car from CNAC's lien is defined in § 506(a)(1):

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use on a plan affecting such creditor's interest.

The pre-BAPCPA version of § 506(a) did not contain a specific valuation standard, leaving it to the courts to determine valuation standards appropriate to specific provisions of and issues under the Bankruptcy Code. Under BAPCPA, Congress added a statutory valuation standard in § 506(a)(2) that applies to redemption of collateral from liens under § 722. Section 506(a)(2) states:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time the value is determined.

11 U.S.C. § 506(a)(2).

The focus of the hearings was evidence of the value of Debtor's car for purposes of redemption. However, one of the statutory requirements for application of § 722 is that the collateral sought to be redeemed must secure "a dischargeable consumer debt." *See In re Cassar*, 139 B.R. 253 (Bankr. D. Colo. 1992). In its written objection, CNAC disputed the Debtor's redemption value. [Doc. # 22]. It also asserted that Debtor had "unclean hands" due to the timing of her purchase of

2

the vehicle and that § 722 should not be used "as a tool for defrauding this creditor by obtaining property from it under false pretenses." [*Id.*]. The court, however, sustained an objection to a question from CNAC's counsel about when Debtor first consulted bankruptcy counsel–a question that would elicit testimony relevant to whether the debt is dischargeable. After the valuation hearings concluded, CNAC timely filed on July 23, 2010, its adversary complaint asserting that the debt owed to it by Debtor that is secured by her car is nondischargeable as having been incurred by actual fraud.

There are two issues that must be addressed with respect to the Motion. First, what is the amount of CNAC's "allowed secured claim" under § 506(a)(2)? Second, how should the issue of whether the car secures a dischargeable debt be handled?

**I. CNAC's Allowed Secured Claim Under §506(a)(2)**

The Sixth Circuit had not ruled before BAPCPA on the proper valuation standards for a secured creditor's allowed claim for purposes of redemption. In the absence of binding Sixth Circuit authority, courts in this circuit generally held that a creditor's allowed secured claim under pre-BAPCPA § 506(a) for purposes of redemption under § 722 was measured by the liquidation value of the collateral, that is, the amount that the creditor would expect to recover upon repossession and sale by auction or other wholesale means. *Triad Financial Corp. v. Weathington (In re Weathington)*, 254 B.R. 895, 899 (B.A.P. 6th Cir. 2000); *see also In re Donley*, 217 B.R. 1004,1007 (Bankr. S.D. Ohio 1998).

The Supreme Court had set a standard for valuing property retained by debtors in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 963, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Observing that § 506(a) of the Bankruptcy Code contained no statutory valuation standard, *Rash* determined that, under § 506(a), the value of property retained when the debtor decides to "cram-down" a creditor's claim in a chapter 13 case is the "cost the debtor would incur to obtain a like asset for the

3

same proposed use." In other words, *Rash* required a debtor to value the creditor's collateral in a chapter 13 case at replacement value.

In new § 506(a)(2) Congress appears to be codifying *Rash* for application to a broader set of legal circumstances.[2] Section 506(a)(2) thus changes the standard generally applied pre-BAPCPA by courts in the Sixth Circuit for valuing collateral and determining a creditor's allowed secured claim for purposes of redemption under § 722. The court must determine in this case "the price a retail merchant would charge for property of that kind [2002 Volkswagen Beetle GL] considering the age and condition of the property at the time value is determined."

Although its is now almost five years since the effective date of BAPCPA, no consensus has emerged in the case law interpreting § 506(a)(2) as to how replacement value for motor vehicles should be determined. The results reached ultimately seem to depend, not entirely surprisingly, on the overall record a court is presented with in a particular case. *See In re Morales,* 387 B.R. 36 (Bankr. C.D. Cal. 2008)(replacement value should be calculated as of the petition date by adjusting Kelley Blue Book or N.AD.A. Guide retail values for a like vehicle); *In re Eddins*, 355 B.R. 849 (Bankr. W.D. Okla. 2006)(Chapter 13 cramdown of non-910 vehicle; N.A.D.A. Guide retail value is starting point); *In re Brown*, C/A No. 06-00197-JW, 2006 Bankr. LEXIS 713, 2006 WL 3692609

---

[2] The Supreme Court's rationale for applying replacement value in the context of chapter 13 cramdowns was that it would more accurately reflect the loss of value of the collateral to the creditor from deterioration caused by retention and continued use of the property by the debtor. *Id.*, 520 U.S. at 962-63. But where the secured claim is being paid in a lump sum, as must now occur by statute under amended § 722, instead of over time as in a chapter 13 plan, and the creditor is not therefore subject to the risk of further collateral deterioration, this rationale does not seem to work. Moreover, in *Rash,* 520 U.S. at 965, n.6, and in case law since *Rash*, *see, e.g., In re Bryan*, 318 B.R. 708, 710 (Bankr. W.D. Mo. 2004)(defines retail value as the price a willing buyer is willing to pay for any car and replacement value as the price a willing buyer is willing to pay for a similar car minus the costs of sale), replacement value was not necessarily equated with retail value, as Congress has now chosen to do for at least some circumstances. Nevertheless, despite this disconnect, the statutory replacement value standard Congress has established in § 506(a)(2) clearly applies to redemption under amended § 722.

4

(Bankr. D.S.C., April 24, 2006)(court rejects debtor's market reports evidence in favor of creditor's appraiser's report); *In re Feagans*, No. 06-20049, 2006 Bankr. LEXIS 2872 (Bankr. D. Kan., October 18, 2006)(court rejects creditor's N.A.D.A. Guide valuation in favor of creditor's proffered opinion testimony from car salesperson as to what she would sell vehicle for on lot)*; In re Mayland*, Bankr. No. 06-10283, 2006 Bankr. LEXIS 967 at *5, 2006 WL 1476927 at *2 (Bankr. M.D.N.C., May 26, 2006) (starting point for determining replacement value under § 506(a)(2) is 90% of the retail value of the vehicle listed by the N.AD.A. Guide, explaining that adjustments still need to be made to the prices printed in the N.A.D.A. Guide, such as for reconditioning costs incurred to put a vehicle into saleable condition).

Debtor commenced her chapter 7 case on April 20, 2010. Debtor bought her used 2002 Volkswagen Beetle GL sedan from J.D. Byrider on March 10, 2010, for $9,888. [Ex. D]. In her Motion, Debtor asserts that the redemption value of the car is $3,400. At the hearings, she expressed opinions of the value of her car varying from $3,000 (July 22) to $4,000 (June 9), although she stated that another dealer told her the car was worth about $6,300. She also submitted as evidence a market value report from Edmunds.com showing a trade-in value of $2,752, a private party price of $3,415 and a dealer retail price of $4,088. [Doc. # 16, pp. 3-4].

A picture of the car shows that it is an attractive vehicle in excellent exterior physical condition. [Ex. A]. The car had 95,461 miles on it when Debtor bought it. [Ex. D]. Debtor testified that it has 96,000 or 97,000 miles on it, so mileage has increased some since its purchase. It is a manual shift car with no power windows or doors, contrary to the assumption of CNAC witnesses. Debtor also testified to various mechanical problems that she has encountered with the car, including the air conditioning not working, high oil consumption, an issue with the wiring harness and a timing belt issue. Debtor stated that she understood it would cost $2,500 to fix these problems, a factor the court infers as being built into her opinions of value of the vehicle. Diminishing the weight and

5

credibility of her testimony as to the severity of the problems is the absence of a written repair estimate and the fact that she had not taken the car back to J.D. Byrider to fix despite having purchased a service contract.

CNAC submitted evidence showing valuations varying from its cost to acquire the vehicle and put it in saleable condition of $5,595.03 [Ex. B]; to Debtor's purchase price of $9,888.00 on March 10, 2010, [Ex. D]; to a Kelly Blue Book suggested retail value of $7,875, [Ex. C]; to J.D. Byrider general sales manager Nick Longenecker's opinion that he would put the car on the lot now for $10,200 or $10,300, and his report that he had found similar vehicles available in this region for from $5,500 to $9,900; to experienced auto wholesaler James Monaghan's opinion that the car is worth from $9,200 to $9,500 at retail, with a low end value of $8,000. Longenecker also testified credibly that a factor impacting the replacement value of this car is that VW Beetles are rare used vehicles to come by in that VW owners tend to be very loyal. Monaghan testified that the used car market in general is tighter now due in part to the general extraction of used vehicles from the marketplace through the federal government's 2009 cash for clunkers program.

The court finds that the CNAC's allowed secured claim for purposes of redemption is $8,000. In so finding, the court finds that the most probative evidence of the value of the vehicle for redemption purposes under § 506(a)(2) in this case is the actual circumstances of its acquisition. Debtor bought the car for $9,888 from J.D. Byrider just over a month before the filing of her petition. J.D. Byrider is a merchant in this geographical area in the regular business of used car sales. Because of its recency, the actual arms length transaction for this vehicle between this Debtor and the instant retail merchant demonstrates that the retail value of the car is much closer to that amount than to the $3,000 to $4,000 amount asserted by the Debtor. The recency of the transaction in which Debtor agreed to pay more than twice as much for the vehicle than she contends it is now worth undercuts Debtor's lay opinion of value, which lacks persuasive substance and weight. The court also

6

discounts Debtor's testimony as to the cost and severity of needed repairs due to the lack of detail and the fact that she hasn't taken steps to effect them. On the other hand, the recency of the transaction also undercuts Longenecker's testimony that he would put the car on the lot now for even more than Debtor agreed to pay for it.

The court notes, however, that Exhibit B shows the purchase price as having $1,395.03 of reconditioning and prospective repair costs built in. Those expenses (brake pads, rotor, wiper blades, oil filter, detailing) either would not have to be incurred now to put the car in its current condition, or represent (to the extent of $400 as testified to by Don Suzor) a reasonable approximation of anticipated additional repair costs to address emergent problems such as those identified by Debtor and indeed contemplated to some extent at purchase by the seller. *See, e,g, Mayland*, 2006 Bankr. LEXIS 967 at *5 (adjustment for reconditioning costs required); *Rash*, 520 U.S. at 965 n.6 Subtracting that amount from the price Debtor paid equals $8,492.97. The court also finds that a further minor reduction is appropriate for the additional mileage on the car since purchase, which brings the value determined hereby to $8,000. This value is also supported generally by the Kelly Blue Book retail value [Ex. C] and by Monaghan's testimony. Monaghan's opinion of the "low end" value of the vehicle was $8,000, although the court is not adopting that amount just because it is his opinion. Rather, while the court generally found Monaghan's testimony the most persuasive, helpful and disinterested of all of the testifying witnesses, he had not examined Debtor's car, he was not precisely aware of Debtor's complaints about problems with the car and he did not have entirely accurate information as to how this car is equipped, all of which causes the court to discount his opinion of retail value in the range of $9,200 to $9,500. Longenecker's and Monaghan's testimony about the availability in the marketplace of Volkswagens and the general tightness of the used car market did, however, effectively and helpfully address the court's initial skepticism that a small eight year old car like this one with nearly 100,000 miles on it would retain such relatively

7

substantial value.

Based on the foregoing reasons and authorities, the court determines that $8,000 is the price a retail merchant would charge Debtor to acquire her car as is. Under § 506(a)(2), the court finds that $8,000 is thus the replacement value that measures CNAC's secured claim for purposes of redemption under § 722.

**II. Dischargeability of Underlying Consumer Debt**

Section 722 permits redemption of specified collateral only from liens securing dischargeable consumer debts. Relief under § 722 must be requested by motion. Fed. R. Bankr. P. 6008. In turn, debts arising through, among other circumstances, certain types of fraud, as CNAC alleges, may be excepted from discharge only if the creditor requests a determination of nondischargeability from the bankruptcy court. 11 U.S.C. § 523(a)(2), (c)(1). Such a request must be made by adversary complaint. Fed. R. Bankr. P. 7001(6). The complaint must be filed no later than 60 days after the date first set for the meeting of creditors. Fed. R. Bankr. P. 4007(c). The objecting creditor bears the burden of proof on a complaint of nondischargeability under § 523(a)(2). *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 280-81 (6th Cir. 1998)*; see Grogan v. Garner,* 498 U.S. 279, 291(1991).

CNAC timely filed its complaint to determine dischargeability of the underlying debt after the hearings concluded. The procedural circumstances of this case, and the court's refusal to allow evidence relevant to nondischargeability to be introduced at the redemption hearing, raise the question of how the dischargeability issue under § 722 should be handled. The time frames in which debtors must seek redemption, *see* 11 U.S.C. § 521(a)(2),(6), are shorter than the deadline for commencing a dischargeability adversary proceeding under § 523(a)(2). Should Debtor be required under § 722 to prove that the underlying debt is dischargeable, or should CNAC be required to prove under § 523(a)(2) that the debt is nondischargeable? If the latter, is an adversary proceeding

8

still required or should proof be presented in the procedural context of the motion to redeem? Based on the statute and procedural rules governing § 523(a)(2) determinations, the court finds that it is the creditor's burden to timely raise and prove nondischargeability in an adversary proceeding in accordance with the applicable rules of procedure, notwithstanding the incongruence of the deadlines governing redemption and nondischargeability proceedings.

CNAC now having timely filed its complaint seeking a determination of nondischargeability, and further having preserved the issue from being resolved through judicial estoppel by its written objection to the Motion and at the hearings, *see Pikeville Energy Group LLC v. Spradlin (In re Alma Energy, Inc.)*, –B.R.–, Case No. 09-8074, 2010 Bankr. LEXIS 2729, *15-*18, 2010 WL 3467682, *5-*6 (6th Cir. B.A.P., Sept. 7, 2010)(silence may give rise to judicial estoppel), the Motion cannot be decided until the adversary proceeding is determined. While the court views its finding of value conclusive of that issue under § 722, Debtor's motion to redeem her car from CNAC's lien will be continued to further order of the court pending resolution of the adversary proceeding. In the interim, the court will separately entertain a motion in this case for adequate protection of CNAC's interest in the collateral should it deem it appropriate to file one.

**IT IS THEREFORE ORDERED** that the replacement value of Debtor's 2002 Volkswagen Beetle GL under 11 U.S.C. § 506(a)(2) that measures CNAC's secured claim for purposes of Debtor's Motion is determined to be $8,000; and

**IT IS FURTHER ORDERED** that Debtor's pending Motion for Authority to Redeem Personal Property [Doc. #16] is hereby continued to further order of the court pending resolution of Adv. Pro. No. 10-3211.